IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> vs. <br><br> JOSEPH WAYNE OPENSHAW, <br><br> Defendant. | ORDER and MEMORANDUM DECISION <br><br><br><br> Case No. 2:08-cr-720 CW |

Defendant Joseph Wayne Openshaw is charged with one count of possession of a firearm and associated ammunition in violation of 18 U.S.C. § 922(g)(1). Now before the court is Mr. Openshaw's second motion to suppress (Dkt. No. 26).[1] This motion to suppress arises out of an allegedly improper search conducted of a cabin conducted on May 6, 2008. Mr. Openshaw contends that the search of the cabin was illegal, making the evidence against him obtained in that search, as well as all evidence stemming from that evidence, inadmissable. Mr. Openshaw accordingly moves for all evidence obtained during the search and all related evidence to be suppressed. The government argues that Mr. Openshaw has no standing to challenge the search of the cabin because he had no expectation of privacy in it. For the reasons below, the court

---

[1] Mr. Openshaw's first motion to suppress, Docket Number 13, was denied without prejudice for the reasons stated on the record for the hearing on that motion held on March 20, 2009. Mr. Openshaw has not renewed his first motion. Note also that Docket Number 49 is also DENIED as moot for the reasons stated on the record on the hearing for the second motion to suppress held on October 20, 2009.

agrees with the government and DENIES Mr. Openshaw's motion.

## BACKGROUND

**The Firearm**

Kane County, Utah Detectives Dan Watson and Osvaldo Macias first came into contact with Mr. Openshaw in November 2007 while they were investigating a homicide on Cedar Mountain, located in Southern Utah. At that time, Mr. Openshaw related an incident to the officers about a time when his step-son expressed interest in knowing what it would be like to kill someone. Mr. Openshaw told the officers that he responded by going upstairs, grabbing his gun, giving the gun to his step-son, and telling his step-son to shoot him. Afterward, Detective Macias spoke with Fire Chief Kenneth Johnson about defendant, who was a volunteer firefighter. Detective Macias asked Chief Johnson to contact him if any new or suspicious information about Mr. Openshaw surfaced.

Six months later, on or about May 6, 2008, Chief Johnson called Detective Macias. Chief Johnson told Detective Macias that he had met with a woman who was preparing a bid on a cabin Mr. Openshaw was renting. The cabin was located at 62 Doc Holliday Lane, Duck Creek Village and its owner was John Coldren. Chief Johnson explained that he had entered the cabin to see if any fire department equipment was inside. He reported that while inside the cabin he observed three rifles. After confirming that Mr. Openshaw was a convicted felon, Detective Macias obtained a search warrant for the cabin.

On May 6, 2008, Detectives Macias and Watson executed the search warrant. The detectives found a Hi Point model 995 carbine rifle, 9mm ammunition, and a Mexican passport with a photograph of Mr. Openshaw but issued in the name of Luis Ramon Falques Moreno. Mr.

Openshaw was not in the cabin at the time of the search, but Detective Macias left a copy of the warrant and a receipt for items seized.

During an unrelated investigation on May 26, 2008, Detectives Watson and Macias contacted Jeff Rybolt, a Duck Creek Village resident. Mr. Rybolt said that he was a friend of Mr. Openshaw and Mr. Openshaw's girlfriend, Leanne, was at her cabin located in Duck Creek Village. Mr. Rybolt said he had seen Mr. Openshaw with a black Hi point 9mm carbine rifle and explained that he recognized the gun type because he owned the same weapon in a stainless finish.

The detectives then went to Leanne's cabin and Mr. Openshaw answered the door. Mr. Openshaw stated he was unaware that the Doc Holliday Lane cabin had been searched by police earlier that month. Mr. Openshaw admitted that he had possessed the Hi Point carbine though he stated that it belonged to his son. Mr. Openshaw was booked into jail, advised of his rights, and questioned further. During that questioning, Mr. Openshaw said he had stored his son's gun in the cabin, had moved it while cleaning, and had checked the magazine to see if it was loaded. He denied, whoever, ever firing the weapon. When asked about the Mexican passport issued in another name but bearing his photograph, Mr. Openshaw did not want to reply.

**The Cabin**

Mr. Openshaw began renting the cabin located at 62 Doc Holliday Lane, Duck Creek Village in about early 2006. Mr. Openshaw kept personal property in the cabin but did not occupy it on a regular basis. He stopped paying rent in November 2007. Mr. Coldren put the cabin on the market for sale in around early 2008.

In early March 2008, Mr. Coldren contacted Andrew Osterhout, owner of a cabin

maintenance business. Mr. Coldren hired Mr. Osterhout to take photographs and change the locks on the cabin. Mr. Osterhout took the job and made two separate visits to the cabin during March 2008 to perform various services. On about March 3, 2008, Mr. Osterhout took photographs of the cabin's exterior and interior and changed the cabin's only lock. About three weeks later, Mr. Osterhout returned to the cabin to "winterize" it. The winterizing process included draining the pipes and water heater, disconnecting heaters, pouring antifreeze in the traps, and taking measures to protect certain appliances from freezing. Mr. Osterhout described the interior of the cabin as lived in but messy, as if it had been occupied but no one had done any cleaning.

Following each service call to the cabin, Mr. Osterhout prepared an invoice documenting the services performed. On the invoice for the second visit, which took place about three weeks after he changed the cabin's lock, Mr. Osterhout noted that there were no signs of anyone coming to the cabin. Mr. Osterhout explained that there were "no trespassing" signs posted on the cabin's window and door. He identified a white square, visible in a photo of the cabin, as the no trespassing sign he observed posted in the window of the cabin at eye level.

Marcus Hansen, Mr. Coldren's real estate agent, is familiar with the cabin and has been inside it numerous times since January 2008. He described the cabin's interior as extremely messy, as if someone had lived there for a while and then simply left without doing any cleaning. Mr. Hansen suggested that Mr. Coldren have the cabin cleaned because it was unpresentable. At Mr. Coldren's request, Mr. Hansen drafted and posted a notice on the cabin doors. The posting gave notice to the effect that occupying the premises would be considered trespassing. Mr. Hansen posted the notice in about the middle of March 2008.

After Mr. Osterhout changed the locks, Mr. Hansen received the new key and continued to have access to the cabin. After the cabin's interior was cleaned, Mr. Hansen inspected it. The personal property from the cabin was boxed up and locked underneath the cabin in case anyone claimed it. No one ever contacted Mr. Hansen to claim those belongings.

Gregory Widner, a special agent with the Bureau of Alcohol, Tobacco, and Firearms for more than seven years, served as case agent in the investigation of Mr. Openshaw. Agent Widner's duties include investigating criminal violations of federal firearms laws. In his investigation in this case, Agent Widner contacted several individuals, including Mr. Coldren, who confirmed the affidavit submitted by the government in support of this motion. In his affidavit, Mr. Coldren corroborates the key evidence presented by the live witnesses at the hearing.

Mr. Openshaw testified that prior to May 2008, he checked on the property every couple of weeks. He noted that he occasionally barbequed on the cabin's porch and peered into the cabin's windows, though he could not recall when he last entered the cabin. He also testified that during 2008, he did not see a trespass notice posted anywhere on the cabin.

Mr. Openshaw acknowledged that he had not even entered the cabin for at least a couple of months prior to the execution of a search warrant in May 2008. Further, he was not aware that the cabin had been searched until he was arrested on May 26, 2008, twenty days after the search warrant was executed. After he found out about the search, Mr. Openshaw did not contact Mr. Coldren, or the property's real estate agent, Marcus Hansen, to arrange to get his personal property from the cabin.

## ANALYSIS

"When a defendant moves to suppress evidence obtained as a result of an allegedly unconstitutional search, he has the burden of demonstrating a subjective expectation of privacy that society is prepared to recognize as reasonable." *United States v. Nicholson*, 144 F.3d 632, 636 (10th Cir. 1998) (citing *United States v. Conway*, 73 F.3d 975, 979 (10th Cir. 1995)). As Fourth Amendment protections are personal in nature and cannot be vicariously asserted, "[i]t is immaterial if evidence sought to be introduced against a defendant was obtained in violation of someone else's fourth amendment rights." *United States v. Arango*, 912 F.2d 441, 445 (10th Cir. 1990) (citing *Rakas v. Illinois*, 439 U.S. 128, 140 (1978)).

In *Arango*, the Tenth Circuit explained the inquiry used to determine whether a defendant's Fourth Amendment rights have been violated:

> [W]e consider two primary factors: whether the defendant manifested a subjective expectation of privacy in the area searched and whether society would recognize that expectation as objectively reasonable. To decide whether a reasonable expectation of privacy exists, we consider concepts of real or personal property law, bearing in mind that "arcane distinctions developed in property and tort law between guests, licensees, invitees, and the like, ought not to control." Although neither ownership nor lawful possession are determinative, they are often dispositive factors.

*Id.* (citation omitted) (quoting *Rakas*, 439 U.S. 143 & n.12). Assessing a defendant's expectation of privacy "is a question of intent which may be inferred from words, acts, and other objective facts." *United States v. Mitchell*, 429 F.3d 952, 958 (10th Cir. 2005) (internal quotation and citation omitted). Moreover, "a defendant lacks standing to complain of an illegal search or seizure of property which has been abandoned." *United States v. Garzon*, 119 F.3d 1446, 1449 (10th Cir. 1997). If the government argues that a defendant has abandoned property and no longer has a privacy interest in that property, the burden of proof is on the government to prove

abandonment by a preponderance of the evidence.  *See U.S. v. Denny*, 441 F.3d 1220, 1226 (10th Cir. 2006).

Here, the court finds that Mr. Openshaw did not manifest a subjective expectation of privacy in the cabin.  The court further finds that the government has carried its burden of showing that Mr. Openshaw abandoned the cabin such that any expectation would not be recognized as reasonable by society in any event.

Turning to Mr. Openshaw's subjective expectation of privacy in the cabin, the court finds no support for such an expectation beyond Mr. Openshaw's bare testimony that he had one.  But the record as a whole supports just the opposite conclusion, *i.e.*, that Mr. Openshaw had no such expectation.  First and most importantly, Mr. Openshaw knew that he had not paid any rent in 2008 and could not remember the last time he had done so.  Failing to pay or account for rent is inconsistent with a subjective belief that one occupies, controls, or otherwise expects privacy in a property.  Equally inconsistent with such an expectation is the fact that Mr. Openshaw had not entered or even attempted to enter the cabin since at least March 2008.  The court finds it less than credible that Mr. Openshaw did not notice that the cabin's lock had been changed and that a no trespass sign had been posted.  Someone with an expectation of privacy in that cabin would have at least asked Mr. Coldren what was going on, and there is no evidence that Mr. Openshaw did so.  Finally, once Mr. Openshaw learned that the cabin had been searched, he did not attempt to make arrangements to collect his property.

That Mr. Openshaw testified that he barbequed at the cabin, sometimes peered in its windows, and kept his tools there does not change this outcome.  First, it seems unlikely that anyone would barbeque at the cabin during the winter months, given the testimony that it was

difficult to access during that season.  Moreover, barbequing on a porch is not the same as entering the cabin to conduct one's personal affairs.  Further, the court does not view Mr. Openshaw's looking into windows as evidencing an expectation of privacy.  To the contrary, the reason Mr. Openshaw had to peer into the windows is because he knew that he had been locked out.  Finally, like barbequing, storing tools at a cabin is not the same as expecting privacy there.

In any event, even if the court were convinced that Mr. Openshaw subjectively felt an expectation of privacy in the cabin, that expectation is not one that society would acknowledge as reasonable.  Put simply, Mr. Openshaw had not paid rent on the cabin or otherwise contacted Mr. Coldren for about six months before the search was executed.  Nor had Mr. Openshaw entered the cabin for at least several months.  As a result, Mr. Openshaw was presumed under Utah law to have abandoned the cabin and given up lawful possession.  See UTAH CODE ANN. § 78B-6-815 (1953) (abandonment presumed when occupant fails to pay rent within 15 days of the due date and the only evidence of occupancy is personal belongings).  *See also State v. Hawkins*, 967 P.2d 966 (Utah Ct. App. 1998) (under Utah law, a defendant abandoned property after he failed to pay rent, landlord changed locks, and defendant did not use property for two months, even though the defendant had not been formally evicted).

It is fairly clear that if Mr. Openshaw had legally abandoned the cabin, he had no expectation of privacy in it that society is willing to acknowledge.  That Mr. Coldren did not formally evict Mr. Openshaw does not convince the court otherwise.  Such proceedings would have been little more than a formality given the situation.  Moreover, even if Mr. Coldren could be said to have engaged in impermissible self help by changing the cabin's locks, that does not mean that Mr. Openshaw would have been able to continue possessing the cabin as a result.

## CONCLUSION

For all of these reasons, the court concludes that Mr. Openshaw lacks standing to challenge the May 6, 2008, search of the cabin.  Accordingly, his second motion to dismiss is DENIED.

SO ORDERED this 13th day of November, 2009.

BY THE COURT:

_____
Clark Waddoups
United States District Judge